# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

ISAAC MONTGOMERY,                    ]
                                     ]
    Plaintiff,               ]
                                     ]
    vs.                      ]       CV-00-N-3160-S
                                     ]
THE CITY OF BIRMINGHAM, ET           ]
AL.,                                 ]
                                     ]
    Defendants.              ]

**ENTERED**

### Memorandum of Opinion

## I.    Introduction

Isaac Montgomery filed this lawsuit in the Circuit Court of Jefferson County, Alabama,

against the City of Birmingham, officer Quentin Dunn, officer Charles Newfield, Jr., and

Police Chief Mike Coppage on September 28, 2000, asserting a number of claims that arise

from his June 2, 2000, arrest.  On November 7, 2000, the defendants removed the action to

this court.  The court now has for consideration the defendants' motion for summary

judgment, filed November 30, 2001.  [Doc. # 25.]  The issues have been briefed by both

parties and are ripe for decision.  Upon due consideration, the motion will be granted in

part and denied in part.

## II.    Facts[1]

On the afternoon of June 2, 2000, Isaac Montgomery, a sixty-seven year old African-

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

American, was the front seat passenger in a vehicle driven by his grandson, Edward Grady. (Grady Dep. at 15-17; Dunn Dep. at 36; Ellison Dep., Ex. 2.) A friend of Grady's, Hartred Williams, occupied a seat in the rear passenger area of Grady's car. (Williams Dep. at 11.) Around 4:00 p.m., while patrolling in the area near Montgomery's home, officers Charles Newfield and Quentin Dunn of the Birmingham Police Department observed that either Grady or Montgomery did not have on a seatbelt. (Dunn Dep. at 19; Grady Dep. at 16-17.) They signaled Grady's vehicle to pull over. (Dunn Dep. at 19-20.) Grady pulled over in the parking lot of a "Church's Fried Chicken" ("Church's") restaurant. (*Id.* at 20.) What occurred thereafter forms the basis of this lawsuit and is disputed in almost every respect.

The evidence, considered in the light most favorable to Montgomery, demonstrates that immediately after initiating the traffic stop, Newfield and Dunn exited the patrol car and approached Grady's vehicle on the driver's side.[2] (Grady Dep. at 20.) While Newfield was conversing with Grady, Montgomery opened the passenger door and attempted to exit the vehicle in order to purchase some chicken from Church's. (Dunn Dep. at 20; Grady Dep. at 25.) Dunn directed Montgomery to remain inside of the vehicle, which he did. (*Id.*) After speaking with Grady a little longer, the officers ordered Montgomery out of the car. (Grady Dep. at 25.) Montgomery expressed his confusion over whether the officers wanted him to remain in the car or get out. (*Id.*) The officers then placed their gloves on and one of them stated, "We've got us one." (*Id.*) They proceeded to Montgomery's side of the car. (Grady Dep. at 71.) Montgomery began to get out of the car per the officers' instructions.

_____

[2]It is undisputed that officers Dunn and Newfield were operating within the line and scope of their employment at all times concerning the incident made the basis of this lawsuit. (Newfield Dep. at 10-11; Dunn Dep. at 7.)

2

(*Id.* at 70-71; Bryant Dep. at 13-14.) Even though he was attempting to comply, Dunn and Newfield began pulling Montgomery from the car. (Grady Dep. at 70-72.) The evidence supports Montgomery's assertions that he did not raise his voice, curse in the manner alleged by the officers, or strike Dunn's hand during the stop, as the officers claim. (*Id.* at 72; Williams Dep. at 39.) It also supports his assertion that he was in no way preventing the officers from removing him from the car. (Grady Dep. at 49.)

While they were pulling Montgomery from the car, Grady told the officers that Montgomery had problems with his leg[3] and both he and Williams asked the officers to give Montgomery more time to get out of the car;[4] however, the officers continued to pull Montgomery out of the car. (Grady Dep. at 32.) After a short period, the officers were able to remove Montgomery from the car, and, upon doing so, dropped or threw him to the ground from a height of approximately three feet. (*Id.* at 33, 36; Bryant Dep. at 14.) Newfield handcuffed him. (Newfield Dep. at 27.) One witness at Church's observed Montgomery moaning in pain on the ground after he was removed from the car. (Ellison Dep. at 48.)

Dunn and Newfield attempted to bring Montgomery to his feet. (Grady Dep. at 33.) However, during each attempt, he collapsed because one of his legs was unable to support him. (Grady Dep. at 33; Pla.'s Ex. 14 at 2.) Upon seeing this, Grady informed the officers that they had broken Montgomery's leg. (*Id.*) The officers called for the assistance of another police vehicle to transport Montgomery to jail because their patrol car did not have a shield separating the back seat of the car from the front. (Newfield Dep. 28.) Officers

---

[3] Montgomery had hip replacement surgery in 1997. (Montgomery Dep. at 19-20; Pla.'s Ex. 12.)

[4] Grady and Montgomery, in fact, were "screaming" this to the police officers. (Grady Dep. at 32.)

3

Kevin Slaughter and Tyesa Slaughter arrived shortly to the arrest scene. (*Id.*) Grady spoke with one of the newly arrived officers, requesting that an ambulance be called. (Grady Dep. at 37.) None was called. (*Id.*) Thereafter, Montgomery was transported to the Birmingham City Jail in the second patrol car. (T. Slaughter Dep. at 13-17.)

The officers' account of the arrest differs materially. According to them, Montgomery attempted on more than one occasion to get out of the car. (Dunn Dep. at 20-21.) Each time, he was instructed to remain in the car. (*Id.*) Officer Dunn, in fact, closed Montgomery's car door more than once as Montgomery opened it. (Newfield Dep. at 24.) During this time, according to the defendants, Montgomery was cursing loudly about the fact that he wanted to go into Church's and purchase some chicken. (*Id.* at 23.) Finally, Officer Dunn placed his hand on the top of the door to keep Montgomery from opening it again. (*Id.* at 24.) Montgomery reached up and struck Dunn's hand for the purpose of removing it from the door. (Newfield Dep. at 24.) At that point, Dunn told Newfield that he was going to arrest Montgomery. (*Id.* at 24; Dunn Dep. at 21.)

Newfield moved from his original position near the drivers door to the passenger side to assist Dunn in removing Montgomery from the car for the purpose of arrest. (Newfield Dep. at 26.) Montgomery refused to exit the car. (Dunn Dep. at 21.) As the officers began to remove Montgomery from the car, he grabbed the steering wheel with one or both hands, requiring one of the officers to pry his hands therefrom. (Williams Dep. at 25.) Dunn admits to allowing Montgomery to slide to the ground after they pulled him out of the car, but only because he refused to stand up. (Dunn Dep. at 22, 29.) Dunn testified that he does not believe that Montgomery was injured during the arrest. (*Id.* at 46.)

4

Montgomery was charged with disorderly conduct, based on his alleged use of profanity, and harassment, based on his alleged striking of Dunn's hand. (*Id.* at 29, 37.)

Montgomery arrived at the city jail and was taken inside in a wheelchair.[5] (T. Slaughter Dep. at 16.) His handcuffs were eventually removed and he was taken through the booking procedure. (Studmire Dep. at 36-37.) Montgomery testified that although he was in pain from his hip injury, he did not communicate this fact to anyone at the jail because no one was around to whom he could complain. (Montgomery Dep. at 56-57.) However, in spite of his testimony, there is evidence that he did, in fact, tell Willie Godwin, a correctional officer present at the jail that evening, that his leg and hip were hurting. (Godwin Statement at 4.)  Godwin, who interacted with Montgomery during and immediately after he bonded out of jail, watched Montgomery's leg collapse when he attempted to get out of the wheelchair. (*Id.*)  Godwin, in fact, had to lift him from the wheelchair and hold him up to sign his paperwork. (*Id.* at 1.) Montgomery was unable to stand from the time that he was removed from Grady's vehicle until he bonded out of jail, six hours later. (Studmire Dep. at 34.)

Montgomery bonded out of jail around 10:22 p.m. (Studmire Dep. at 25.) After he was brought to his car in a wheelchair, his wife and son took him directly to the emergency room at the University of Alabama at Birmingham hospital. (Montgomery Dep. at 67-68.) At the emergency room, Montgomery was diagnosed with a left femoral periprosthetic fracture. (Ellison Dep., Ex. 8.) He spent two weeks at the hospital where he underwent

---

[5]According to officer Kelvin Slaughter, when trying to get out of the car, Montgomery could not move his legs. (K. Slaughter Dep. at 22.)

surgery to repair his broken leg. (Pla.'s Ex. 12.) He spent another week, and possibly two, undergoing rehabilitation. (Eirvine Montgomery Dep. at 29; Montgomery Dep. at 51.)

Montgomery was subsequently acquitted of the harassment and disorderly conduct charges in Birmingham Municipal Court. (Newfield Dep. at 43-44; Dunn Dep. at 49-52.) On August 28, 2000, he filed a "Notice of Claim."[6] (Def.'s Ex. 11.) On September 8, 2000, Montgomery signed a formal complaint against Dunn and Newfield with the Birmingham Police Department's Internal Affairs Division. (Ellison Dep., Ex. 2.) The narrative of the complaint stated that Dunn and Newfield used excessive force against Montgomery during the arrest and caused injuries to his body. (*Id.*) After an investigation by Sergeant Fred Ellison, the conclusion was reached that the allegations made by Montgomery against the officers should be classified as "unfounded." (*Id.* at 24-28, 108-15, Ex. 13.)

## III.   Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

---

[6] The claim stated that Dunn attempted to restrict Montgomery's movements during a traffic stop at Church's. (Def.'s Ex. 11.) It alleged that both officers removed Montgomery from the car and punched and kicked him about the head and body, causing his eye to swell and producing bruises and cuts to his body. (*Id.*) Plaintiff, as evidenced by both his brief and statement of facts in response to the defendant's motion for summary judgment, is not pursuing such allegations in the present suit. To the extent that the earlier filed notice of claim is inconsistent with Montgomery's present testimony and other evidence presented to this court, the court reminds the parties that credibility is for the jury.

6

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*quoting* Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.   Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (*quoting* Fed. R. Civ. P. 56(e)).

After the plaintiff has properly responded to a motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P 56(c).  The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-

7

movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.    Discussion

Montgomery has brought a number of claims against the defendants.  Pursuant to 28 U.S.C. § 1983,[7] he has asserted the following:  false arrest, excessive force, and malicious prosecution in violation of the Fourth Amendment; unlawful arrest in violation of the First Amendment; and deliberate indifference to serious medical needs in violation of the Fourteenth Amendment.  He has also asserted a number of state law claims: assault and battery, unlawful arrest and detention, and malicious prosecution.  Each claim is discussed separately.

### A.    Claims Against Chief Coppage

Montgomery has voluntarily abandoned all of his claims in regard to Mike Coppage. Summary judgment will therefore be granted in his favor and he will be dismissed from the action.

### B.    Constitutional Claims

#### 1.    False Arrest

Montgomery initially claims that his arrest by Dunn and Newfield violated certain rights guaranteed by the Fourth Amendment.  There is no dispute that Montgomery's arrest

---

[7] 42 U.S.C. § 1983, while providing no substantive rights, is the vehicle by which an individual is able to bring a cause of action for the deprivation of any right under color of state law that is secured by the Constitution. 42 U.S.C. § 1983 (2001).

was affected under the color of state law.  Moreover, there is no dispute that the Fourth Amendment secures individuals against arrests without probable cause and therefore provides Montgomery with the right that he here seeks to protect.  The officers, however, argue that they are protected by qualified immunity and are therefore not liable to Montgomery for his arrest.[8]

The starting point in a case such as this is whether the officers had probable cause to arrest Montgomery.  "A law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990).  It is clear, when the facts are viewed in the light most favorable to Montgomery, that the officers did not have probable cause to arrest him.  According to the evidence presented, Montgomery did not raise his voice, did not curse, did not resist being taken out of the car, and did not strike either officer, the only reasons cited by the officers for their arrest of him for harassment and disorderly conduct.  As a result, there was clearly no basis for his arrest, and certainly no basis upon which this court could find that there was probable cause to arrest him.[9]

---

[8] Liability of the City of Birmingham will be addressed below.

[9] Interestingly, neither party has raised or addressed the possible impact of *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) on the present case.  In that case, the Supreme Court held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater*, 532 U.S. at 354.  The parties have approached this case from the direction of whether Montgomery committed either of the offenses for which he was arrested, not whether he was guilty of any other criminal offense.  The facts disclose that Montgomery may have been in violation of a seat belt ordinance at the time of his arrest. *See* Grady Dep. at 17.  However, there is a dispute of fact on this issue, precluding summary judgment. *Compare* Newfield Dep. at 21 *and* Dunn Dep. at

The analysis does not end here, however.  The officers claim that they are protected by qualified immunity.  "An officer is entitled to qualified immunity . . . where the officer had arguable probable cause, that is, where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest the plaintiffs." *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998) (internal quotation marks omitted).  In analyzing qualified immunity, the Eleventh Circuit has stated:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . . The right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . The standard is an objective one . . . and therefore does not include an inquiry into the officer's subjective intent or beliefs. . . . In determining whether qualified immunity exists, the issue is not probable cause in fact but arguable probable cause. . . . Actual probable cause is not necessary for an arrest to be objectively reasonable.

*Brescher*, 904 F.2d at 578-79.  At the time that Montgomery was arrested, the law was clearly established that the arrest of an individual violated the Fourth Amendment if it was accomplished without probable cause to believe that a crime had been committed.  *See id.* at 579.  In order to determine whether qualified immunity protects officers Dunn and Newfield, then, the court "must determine whether reasonable officers in the same circumstances and possessing the same knowledge as the [officers] could have believed

---

19 *with* Grady Dep. at 17.  Indeed, the court finds it significant that the defendant police officers testified at deposition that it was Grady's failure to wear a seatbelt that caused them to initiate the traffic stop.  *Id.*

that probable cause existed to arrest" Montgomery for harassment and disorderly conduct.
*Id.*

Viewing the facts and evidence in the light most favorable to Montgomery, as is required of this court at the present stage, the court is of the opinion that the officers are not entitled to summary judgment on their defense of qualified immunity. According to the record as read in the proper light, Montgomery did not raise his voice, did not curse, did not attempt to get out of the car after he was instructed to remain in it, only began to exit the car a second time when ordered to do so by the officers, and did not strike the officers. Because there is a question of fact as to whether reasonable officers with the same knowledge as Dunn and Newfield could have believed that there was probable cause to arrest Montgomery for harassment and disorderly conduct in light of the fact that all of the bases for the arrest are disputed by substantial evidence, this court is precluded from finding that they are protected by qualified immunity as a matter of law. Indeed, that the officers' argument in favor of qualified immunity rests on materially different facts than those established by Montgomery demonstrates to this court the impropriety of summary judgment in this case.

## 2. **Excessive Force**

Montgomery next asserts that the force exerted by the officers in arresting him was excessive, in violation of the Fourth Amendment.[10] Were Montgomery's sole basis for this

---

[10]Montgomery properly brings his excessive force claim under the Fourth Amendment as the actions he complains of occurred in the context of an arrest. *See Graham v. Connor*, 490 U.S. 386, 394 (1989). In other circumstances, excessive force claims can be brought under the Eighth and Fourteenth Amendments. *See Skritch v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002); *Vineyard v. County of Murray, Ga.*, 990 F.2d 1207, 1211 (11th Cir. 1993). Indeed, in an opinion released today, the court was required to analyze an excessive force claim under the Fourteenth Amendment. *See Murray v. Sexton*, CV-00-N-3751-W.

claim to rest upon the argument that because his arrest was illegal, any force utilized in effectuating it was excessive as a matter of law, it would be subsumed by his false arrest claim, discussed *supra*. *See Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995). Montgomery, however, has asserted a discrete claim, arguing that even if his arrest was lawful, the officers utilized excessive force when arresting him. In response, the officers again assert that they are entitled to qualified immunity and that summary judgment is therefore appropriately granted in their favor.

The law regarding excessive force in violation of the Fourth Amendment is well-defined in the Eleventh Circuit. In *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997), the court stated:

> An official sued as an individual is entitled to qualified immunity if his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." . . . Fourth Amendment jurisprudence has staked no bright line for identifying force as excessive. Therefore, unless a controlling and factually similar case declares the official's conduct unconstitutional, an excessive-force plaintiff can overcome qualified immunity only by showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw.

*Id.* at 1419. Montgomery does not offer caselaw demonstrating that the force used was excessive in this case. Instead, he argues that the unlawfulness of the officers' conduct when arresting him was readily apparent to them. A determination on this point requires the application of a number of factors. According to the Eleventh Circuit:

> In determining whether an officer's use of force was objectively reasonable, thereby entitling the officer to qualified immunity, we consider a variety of factors including "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury

> inflicted and, (4) whether the force was applied in good faith or maliciously
> and sadistically." *Moore v. Gwinnett County*, 967 F.2d 1495, 1498 (11th
> Cir.1992)(quoting *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir.1986)). A
> court should also consider "the severity of the crime, whether the suspect
> pose[d] an immediate threat, and whether the suspect [was] resisting or
> fleeing." *Post*, 7 F.3d at 1559 (citation omitted). We also have had occasion
> to observe recently that "this Circuit has established the principle that the
> application of de minimis force, without more, will not support a claim for
> excessive force in violation of the Fourth Amendment." *Nolin*, 207 F.3d at
> 1257.

*Slicker v. Jackson*, 215 F.3d 1225, 1232-33 (11th Cir. 2000).

After reviewing the evidence in light of the foregoing principles, the court finds that

there is a question of material fact as to whether the officers are entitled to qualified

immunity, precluding summary judgment. Even if this court were to assume that there was

arguable probable cause to arrest Montgomery (which, as discussed above, the court must

do in order to reach the issue of excessive force as a discrete claim), the fact that he was

attempting to exit the car per the officers' orders during the arrest would tend to limit the

need for the application of any force whatsoever in removing him from the car. As there

was little need to apply force, the application of force sufficient to break Montgomery's leg

seems quite excessive under these circumstances.    The injury inflicted, a femoral

periprosthetic fracture of Montgomery's left leg, required surgery, a two-week stay in the

hospital, and rehabilitation upon discharge.    The crimes with which Montgomery was

charged, disorderly conduct and harassment, certainly could not be classified as "severe"

in any sense of that word.    There is no reading of the evidence that would allow an

inference that Montgomery posed an immediate threat to the officers. There is substantial

evidence that Montgomery was not resisting arrest at all, but merely attempting to comply

with the officers' request that he exit the car. Finally, it seems clear to the court that the breaking of Montgomery's leg by forcefully removing him from the car and dropping or throwing him to the ground at a height of three feet, breaking his leg to the point that surgery was required, exceeds the definition of "de minimis force." As a result, summary judgment is inappropriate on Montgomery's discrete claim of excessive force in violation of the Fourth Amendment.

### 3.  Deliberate Indifference to Serious Medical Needs

Montgomery also claims that defendants violated his Fourteenth Amendment right to due process by demonstrating deliberate indifference to his serious medical needs.[11] The defendants respond that there was no such violation of Montgomery's constitutional rights and that, even if there were, they are entitled to qualified immunity, and thus summary judgment. There are two levels of inquiry that the court must undertake in analyzing a claim of deliberate indifference to serious medical need. *See Saucier v. Katz*, 121 S. Ct. 2151, 2156 (2001); *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000). First, the court must determine whether the plaintiff has demonstrated that the actions alleged actually rise to the level of a constitutional violation. *Id.* If the plaintiff can make such a showing, the court will reach the question of qualified immunity and determine whether the constitutional violation was clearly established in law at the time it occurred. *Id.* After examining the record in

---

[11] Montgomery properly asserts his claim of deliberate indifference to serious medical need under the Fourteenth Amendment, as such claims, as to arrestees and pretrial detainees, arise under the due process clause of that amendment. *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997). After conviction, deliberate indifference claims are properly raised under the Eighth Amendment. *Id.* The Eleventh Circuit has analyzed claims under each identically, however, in spite of the fact that the rights protected spring from different sources and in spite of its recent recognition that the standards under each may differ. *Id.*; *Marsh v. Butler County*, 268 F.3d 1014, 1024 n.8 (2001) (en banc).

14

light of this framework, the court is of the opinion that Montgomery has failed to show that the alleged conduct rose to the level of a constitutional violation and that, at any rate, the defendant officers are entitled to qualified immunity.

At the outset, the court points out that Montgomery has not sued any individual that could be liable for the time that he spent at the city jail without medical treatment. Certainly, Montgomery has not shown how officers Dunn and Newfield, the arresting officers and the only individual defendants left in this case, can be liable for any deliberate indifference that the staff at the city jail may have shown to Montgomery. Indeed, there is absolutely no evidence that, after Montgomery was taken into the jail and booked, the defendant officers had any further contact with him.  Thus, the court will not consider evidence of the amount of time that Montgomery is alleged to have waited at the jail without medical treatment. *See Newsome v. Webster*, 843 F. Supp. 1460, 1469 (S.D. Ga. 1994) ("[Plaintiff]'s denial of medical treatment claim is equally baseless. Stahler, the arresting officer, had nothing to do with [plaintiff]'s medical care at the jail and as a matter of law would not be accountable under § 1983 had she been denied proper medical care.")  In this light, then, the initial question presented to the court is whether the defendant officers' decision not to seek medical attention for an arrestee's admittedly serious but non-life threatening injury for a short period of time as they waited for him to be transported to the city jail rises to the level of deliberate indifference to the arrestee's serious medical needs in violation of the Fourteenth Amendment.

15

The law as to deliberate indifference to a serious medical need by a state official was recently restated by the Eleventh Circuit. In *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000), the court stated:

> Stating a claim [for deliberate indifference to serious medical needs] requires satisfying two minima (from which the case law has ultimately derived four requirements): First, there must be, objectively speaking, conduct by public officials "sufficiently serious" to constitute a cruel or unusual deprivation--one denying the minimal civilized measure of life's necessities. . . . Second, there must be a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish.

*Taylor*, 221 F.3d at 1257 (citations and internal quotations omitted). As for the requirement of an objectively serious deprivation, the court noted two prongs:

> [I]t is necessary to demonstrate, first, an objectively serious medical need, one that, if left unattended, poses a substantial risk of serious harm, and second, that the response made by public officials to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law.

*Id.* at 1258 (alterations, citations, and internal quotations omitted). The court identified two prongs as to the second requirement that there be a subjective intent to punish on the part of the official: "awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . drawing of the inference." *Id.* (alterations and citations omitted).

The court will accept, for the purpose of summary judgment, that Montgomery's injury rose to the level of a serious medical need, satisfying the first requirement. As to the second requirement, however, Montgomery does not fair as well. The facts indicate that Montgomery's leg was broken, he was unable to walk, he was experiencing pain, and his

16

grandson requested that an ambulance be called. However, the record is equally clear that there was nothing inherently life-threatening about Montgomery's condition. Indeed, there is no allegation that because officers Dunn and Newfield sent Montgomery to jail (where, it is undisputed, a nurse was present and a medical screening was to be administered) rather than calling an ambulance, as his grandson requested, his condition was worsened. It is uncontested that Montgomery did not ask to be sent to a hospital. In fact, in his deposition, he stated that the first time he realized he was going to have to go to the hospital was when his wife and son arrived at the jail to pick him up, approximately six hours after he had been arrested. The record also indicates that Montgomery did not complain about his pain to anyone at the scene of his arrest or to officers Kelvin and Tyesa Slaughter who transported him to the jail, though he alleges that he was suffering from pain while he was at the jail. Moreover, Montgomery has failed to demonstrate he was actually in the custody of officers Dunn and Newfield for an extended period of time at the scene of his arrest. Indeed, the record discloses that Montgomery was in cuffs within two minutes of the stop, that officers Kelvin and Tyesa Slaughter arrived on the scene within three minutes of being called, and that the drive to the Birmingham City Jail was short, less than two minutes.

The court must therefore determine, in light of the foregoing facts, whether a reasonable jury could find that the defendant officers' response to Montgomery's serious medical need constituted an unnecessary and wanton infliction of pain. After thoroughly reviewing the case law, the court is confident that no reasonable jury could conclude that the officers' response in delaying medical treatment for a short period of time and sending Montgomery to jail, where a nurse was on staff and a medical screening awaited him, rather

17

than calling an ambulance, amounted to an unnecessary and wanton infliction of pain, especially when, as noted above, the condition was not life-threatening and was not exacerbated by the delay. To be sure, as Montgomery has pointed out, the defendant officers may have violated the guidelines of the Birmingham Police Department regarding injured persons taken into police custody by not transporting Montgomery to the hospital prior to taking him to jail,[12] the Eleventh Circuit has clearly stated that "failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence." *Taylor*, 221 F.3d at 1259. As noted above, mere negligence on the part of the officers will not support a claim of deliberate indifference to serious medical needs.

Because a reasonable jury could not find that the officers' response represented an unnecessary and wanton infliction of pain, the court, without reaching the remaining elements, finds that Montgomery's allegations do not rise to the level of a violation of the Fourteenth Amendment. Even if they did, however, the court is convinced that the officers are protected by qualified immunity.[13]

The Eleventh Circuit has said: "A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the preexisting law dictates, that is,

---

[12] *See* Pla.'s Ex. 15. The guidelines are ambiguous as to which officers are responsible for transporting the injured arrestee to the hospital when, as in this case, the arresting officers are unable to actually effectuate the transporting of the arrestee. *See id.*

[13] In *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994), the Eleventh Circuit, in dicta, stated that if one is able to demonstrate deliberate indifference to a serious medical need in violation of the constitution, then qualified immunity, by its very nature, is inapplicable as a defense to that violation. *See Hill*, 40 F.3d at 1186. More recently, however, the court held that that statement was incorrect because it improperly muddled the underlying tort with the affirmative defense to that tort, two issues that should and do remain distinct. *See Marsh v. Butler County*, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc).

18

truly compels, the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." *Marsh v. Butler County*, 268 F.3d 1014, 1030-31 (11th Cir. 2001) (en banc) (quotations omitted). The cornerstone of qualified immunity is "fair and clear notice" to the official. *Id.* at 1031. Thus, "courts must diligently analyze the preexisting case law to determine whether it really did provide plain notice to every reasonable government official that the pertinent conduct, in the specific circumstances, would clearly violate preexisting federal law."[14] *Id.*

Although Montgomery has set forth a number of cases in regard to deliberate indifference to a detainee's or prisoner's serious medical condition, none of them contain fact patterns that are even remotely similar to the one presented by the present case. After conducting its own review, the court has likewise been unable to unearth any controlling cases that demonstrate that the law is clearly established that a short delay in providing treatment to an arrestee's serious but non-life threatening condition by sending him to jail where a nurse was available and a medical screening was to be performed upon him, rather than calling an ambulance, is a violation of the arrestee's Fourteenth Amendment right to due process, especially when the delay does not result in the worsening of that condition. Indeed, the cases pointed out by Montgomery demonstrate that the law is clearly

---

[14] The court acknowledges that there is an exception to the general rule that challenged conduct must be proscribed by factually similar case law: some "general statements of law are capable of giving fair and clear warning in some circumstances" without the need for prior, factually similar case law. *See Marsh*, 268 F.3d at 1031 n.9. However, the Eleventh Circuit has warned district courts that "[t]he defense of qualified immunity bars absolutely a judge and jury from making, in effect, new law for a case to fit the particular circumstances that faced the public official at the time of the pertinent event and then applying this new law basically retroactively in the case to make an award of damages." *Id.* The plaintiff does not appear to argue that the exception is applicable in the present case. However, to the extent that he does, the court has not been pointed to, and has not located, any "general statements of law" that are capable of giving fair and clear warning to the officers in the present case that their conduct was unconstitutional without the need for prior, factually similar case law.

19

established in this area only as regards a delay on the order of hours in providing medical attention, not the short amount of time at issue in the present case. *See Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994) ("The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay. A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference."); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("Even if we were to recognize as de minimus delays of a few seconds or minutes, a deliberate delay on the order of hours in providing care for a serious and painful broken foot is sufficient to state a constitutional claim."). Thus, even if Montgomery has stated a Fourteenth Amendment due process claim for deliberate indifference, the defendant officers are entitled to qualified immunity.

### 4. First Amendment

Though not entirely clear, it appears from Montgomery's brief that the basis of his First Amendment claim is bound up tightly with his claim that he was falsely arrested for disorderly conduct in violation of the Fourth Amendment. In similar circumstances, the Eleventh Circuit applied the same analysis employed by this court in addressing Montgomery's Fourth Amendment false arrest claim in a case involving an allegedly false arrest for disorderly conduct, in violation of the First and Fourth Amendments, for use of profanity directed at a police officer. *See Gold v. City of Miami*, 121 F.3d 1442 (11th Cir. 1997). In the present case, the court is required to analyze the evidence in the light most favorable to Montgomery. In so doing, the court must accept, as discussed above, that Montgomery did not engage in the behavior made the basis of the disorderly conduct

charge.  The court will not accede to Montgomery's implicit invitation to decide whether there was probable cause (or arguable probable cause) to arrest him for disorderly conduct should the fact-finder determine that he did, in fact, engage in the behavior made the basis of the disorderly conduct charge.  Such a determination must wait until a later day.

To the extent that Montgomery's First Amendment claim is separate from his false arrest claim, the court finds that summary judgment is improper.  The defendant officers' only argument in favor of summary judgment as to the First Amendment claim is that they are qualifiedly immune to the Fourth Amendment claim.  *See Redd v. Enterprise*, 140 F.3d 1378, 1384 (11th Cir. 1998) ("[W]hen an officer has *arguable* probable cause to believe that a person is committing a particular public offense, he is entitled to qualified immunity from suit, even if the offender may be speaking at the time that he is arrested.").  However, the court has determined, as to the Fourth Amendment claim, that there are issues of material fact that must be resolved before the court can decide the applicability of qualified immunity.  The basis of their argument being the same, then, the court must also deny summary judgment as to the First Amendment claim.

### 5.    Malicious Prosecution

Although there is some dispute among the circuits, it is clear that, in the Eleventh Circuit, a claim of malicious prosecution may be brought pursuant to 42 U.S.C. § 1983 as a violation of the Fourth Amendment right to be free from unreasonable seizure.  *Uboh v. Reno*, 141 F.3d 1000, 1002-03 (11th Cir. 1998).  In analyzing the elements of such a claim, a court is to look to the tort as it has developed in the common law.  *Id.* at 1004 ("Because the species of Fourth Amendment violation alleged in this case arises by way of analogy to the

common law tort of malicious prosecution, courts historically have looked to the common law for guidance as to the constituent elements of the claim.").

In Alabama, the elements of a malicious prosecution claim include: "(1) a prior judicial proceeding; (2) instigated by the defendant; (3) without probable cause; (4) with malice; (5) which was terminated in favor of the plaintiff; and (6) damages." *Delchamps, Inc. v. Larry*, 613 So. 2d 1235, 1238 (Ala. 1992). The only element in dispute, per the defendants' brief, is the third -- whether the officers lacked probable cause to arrest Montgomery. As discussed more fully above in relation to Montgomery's false arrest claim, it is clear that there are issues of material fact that preclude this court, at the present stage, from determining whether the officers did, in fact, possess probable cause to arrest Montgomery. Therefore, summary judgment will be denied on this claim.

### 6.   Municipal Liability

Montgomery asserts that the City of Birmingham is also liable under § 1983 for the deprivations of his constitutional rights of which he complains. "It is well established that a municipality may be held liable under § 1983 only when the deprivation at issue was undertaken pursuant to city 'custom' or 'policy,' and not simply on the basis of *respondeat superior*." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991). "[M]unicipal liability also may be based on a claim of inadequate training where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants such that the failure to train can be properly thought of as a city policy or custom that is actionable under § 1983." *Sewell v. Town of*

*Lake Hamilton*, 117 F.3d 488, 489-90 (11th Cir. 1997) (citations, internal quotations, and alterations in original omitted).

In his complaint, Montgomery asserted a number of bases for municipal liability. However, in response to the present motion, he rests his argument of municipal liability on a single ground: that the city had a custom of deliberate indifference towards police misconduct by keeping officers on its police force when it knew of those officers' propensity to use excessive force. The Eleventh Circuit defines a "custom" as "a practice that is so settled and permanent that it takes on the force of law." *Sewell*, 117 F.3d at 489. "To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Brown*, 923 F.2d at 1481.

The entire basis of Montgomery's argument that the city has a custom of leaving officers on staff that have a known propensity for use of excessive force is Dunn's past record of discipline and complaints that had been lodged against him. In 1996, he was suspended for three days because he gave a false statement about the force that some other officers had used on a prisoner. In 1997, Dunn was suspended for sixty days for reporting that he had fired three shots at a suspect when, in fact, he had fired five shots. A final disciplinary action occurred in 1999 when he was given a thirty day suspension for using excessive force on an arrestee. Prior to Montgomery's complaint, two complaints were received against Dunn. In 1998, an arrestee alleged that Dunn had used excessive force against him. The complaint was determined to be unfounded. In 2000, an individual

23

complained that Dunn had referred to him in an offensive and degrading manner.  The complaint was marked as "not sustained."

Initially, it should be noted that two of the above incidents do not even remotely relate to a propensity on the part of defendant Dunn to utilize excessive force: the false statement in 1996 and the alleged offensive reference to an individual in 2000.  In fact, Montgomery has not demonstrated that the 1997 incident that resulted in a sixty day suspension is related to the use of excessive force, as Dunn appears to have been disciplined for falsely stating the amount of times he fired his gun, not for the amount of force he utilized.  Thus, the court is actually confronted with only two incidents that directly bear upon Montgomery's allegation of a custom on the part of the city to keep individuals on its force with a propensity to use excessive force.

Throughout its argument in this regard, Montgomery refers to the city's retention of Dunn "and others like him" for the purpose of showing a custom, perhaps realizing that the instances involving Dunn are not enough to demonstrate a custom on the part of the city.  Whatever the reason, Montgomery has failed to put forth any evidence that there are others "like Dunn" who have been retained in spite of allegations of excessive force.  Montgomery refers to this court's decision on this issue as a "close call."  It is not.  After reviewing the applicable case law, this court is of the opinion that there is simply no way that a reasonable jury could find that the city's retention of defendant Dunn in spite of a few disciplinary actions and complaints rises to the level of a custom of retaining individuals with a propensity to use excessive force against citizens.

24

Primarily, there has been no showing that the alleged practice is "widespread," which is required to establish a custom. *See Brown*, 923 F.2d at 1481. Indeed, Montgomery has not submitted any evidence that any officer other than the two in the present lawsuit have engaged in the use of excessive force. Further, far from tacitly authorizing improper police practices, such as the use of excessive force, the record is clear that Dunn has been disciplined on three separate occasions, resulting in over ninety days of suspension, refuting any implication that the city is not interested in correcting the behavior of officers who engage in misconduct. Moreover, the only evidence submitted in this case regarding investigations of citizen complaints tends to demonstrate that such investigations are thorough and include the questioning of unbiased witnesses and the preparation of detailed reports. *See* Pla.'s Ex. 14. Thus, there is no evidence that the city ignored complaints by citizens of police misconduct. Based on the record, then, summary judgment is clearly due to be granted in favor of the city, as there is simply no evidence from which a reasonable jury could conclude that the city employed a custom, as defined by the Eleventh Circuit, of retaining officers in spite of their propensity to use excessive force.

### C.     State Law Claims

Montgomery has asserted three state law claims against the defendants: malicious prosecution, assault and battery, and false arrest/imprisonment. Defendants, while not addressing the underlying torts, respond that they are shielded by Ala. Code § 6-5-338, which provides Alabama's version of qualified immunity: discretionary function immunity. That provision states in pertinent part:

25

§ 6-5-338. Immunity from tort liability for conduct in the line of duty; limitation;
certain employers of off-duty officers to maintain liability coverage; penalty
for failure to maintain.

(a) Every peace officer . . . who is empowered by the laws of this state to
execute warrants, to arrest and to take into custody persons who violate, or
who are lawfully charged by warrant, indictment, or other lawful process, with
violations of, the criminal laws of this state, shall at all times be deemed to be
officers of this state, and as such shall have immunity from tort liability arising
out of his or her conduct in performance of any discretionary function within
the line and scope of his or her law enforcement duties.
(b) This section is intended to extend immunity only to peace officers and
governmental units or agencies authorized to appoint peace officers. . . .

Ala. Code § 6-5-338 (2001).  Officers Dunn and Newfield argue that they are entitled to

discretionary function immunity because, at the time of the arrest, they were engaged in a

discretionary function.  The city argues that section (b) provides it with the same immunity

to which the officers are entitled.

The dispositive issue on the defense of discretionary function immunity in this case

is whether, at the time of the arrest, the officers were engaged in a discretionary function.

Until recently, the law of the State of Alabama, which this court is bound to apply to

Montgomery's state law claims, had been clear that when officers are engaged in an arrest,

they are engaged in a discretionary function.  *See Ex parte Cranman*, 792 So. 2d 392, 405

(Ala. 2000).  The only way one could overcome this defense was to demonstrate that the

officers affecting the arrest acted in bad faith, willfully, or with malice.  *See id.*  The law,

however, changed on January 18, 2002, when the Supreme Court of Alabama delivered its

opinion in *Telfare v. City of Huntsville*, 2002 WL 64554 (Ala. 2002).

In *Telfare*, the Court was faced with an appeal from a plaintiff who argued that the

defendant city had been improperly granted summary judgment on its defense of

26

discretionary function immunity. *Telfare*, 2002 WL at *4-5. In that case, the plaintiff had sought to hold the city liable for the acts of its officer in arresting him for misdemeanors allegedly committed outside of the officer's presence without first obtaining a warrant. *Id.* The Court noted that Alabama law, in providing for the situations in which an individual can be arrested without a warrant, does not allow for a warrantless arrest for misdemeanors occurring out of the presence of the arresting officer. *Id.* at *5. The Court, turning to the facts before it, held that because Alabama law did not allow for the arrest at issue in that case, the officer was not engaged in a discretionary function. *Id.* at *5-6. Because the officer was not engaged in a discretionary function, he was not entitled to discretionary function immunity. *Id.* at *6. Thus, the city was likewise not entitled to such immunity. *Id.* The Court therefore reversed summary judgment and remanded for further proceedings. *Id.*

The court notes that *Telfare* indicates a shift in Alabama law that appears to intermingle the concepts of unlawful arrest and discretionary function immunity. Whereas before *Telfare*, an arrest was generally considered to be a discretionary function regardless of whether it was lawful, *Telfare* seems to indicate that when the law does not allow for an arrest in a particular situation, such an arrest is not a discretionary function and the arresting officer is not entitled to immunity therefor. While the court is concerned about the far reaching implications of such a rule and questions whether the Supreme Court intended to affect such a change in Alabama law, the import of the Court's decision is clear and unambiguous. It is this court's duty, in spite of any questions it may have, to apply the laws of the State of Alabama as the State's highest court has interpreted them.

27

The evidence in this case, which was discussed at length earlier in this memorandum, demonstrates that there is an issue of material fact as to whether officers Dunn and Newfield were engaged in a lawful arrest pursuant to the laws of the State of Alabama. Rule 4.1(a)(1) of the Alabama Rules of Criminal Procedure states:

> (1) A law enforcement officer may arrest a person without a warrant if:
> (i) The law enforcement officer has probable cause to believe that a felony has been committed, or is being committed, and that the person to be arrested committed it, or
> (ii) Any offense has been committed in the law enforcement officer's presence or view, or
> (iii) The arrest is otherwise authorized by statute, such as Ala. Code 1975, §§ 32-5-171, 32-5A-191, 15-10-3.

Ala. R. Crim. Pro. 4.1(a)(1) (2001). Ala. Code § 15-10-3(a) reads:

> (a) An officer may arrest a person without a warrant, on any day and at any time in any of the following instances:
> (1) If a public offense has been committed or a breach of the peace threatened in the presence of the officer.
> (2) When a felony has been committed, though not in the presence of the officer, by the person arrested.
> (3) When a felony has been committed and the officer has reasonable cause to believe that the person arrested committed the felony.
> (4) When the officer has reasonable cause to believe that the person arrested has committed a felony, although it may afterwards appear that a felony had not in fact been committed.
> (5) When a charge has been made, upon reasonable cause, that the person arrested has committed a felony.
> (6) When the officer has actual knowledge that a warrant for the person's arrest for the commission of a felony or misdemeanor has been issued, provided the warrant was issued in accordance with this chapter. However, upon request the officer shall show the warrant to the arrested person as soon as possible. If the officer does not have the warrant in his or her possession at the time of arrest the officer shall inform the defendant of the offense charged and of the fact that a warrant has been issued.
> (7) When the officer has reasonable cause to believe that a felony or misdemeanor has been committed by the person arrested in violation of a protection order issued by a court of competent jurisdiction.

> (8) When an offense involves domestic violence as defined by this section,
> and the arrest is based on probable cause, regardless of whether the offense
> is a felony or misdemeanor.

Ala. Code § 15-10-3(a) (2001). Montgomery has asserted, and has presented evidence, that

he did not engage in the conduct alleged by the officers. Neither of the above-quoted

provisions provides that an officer may arrest an individual for misdemeanors in which the

individual clearly did not engage.   Since there is a question of fact as to whether

Montgomery's arrest was lawful, there is also a question of fact regarding whether the

officers were engaged in a discretionary function. Therefore, the court is not currently able

to decide, as a matter of law, whether the officers, and the city by implication, are entitled

to discretionary function immunity. As with several of the federal claims discussed *supra*,

the court will await findings of fact by the jury before reaching a legal conclusion as to

whether the defendants are shielded by Ala. Code § 6-5-338.

The city makes a separate argument that it cannot be held liable for intentional,

malicious acts, relying on Ala. Code § 11-47-190. That provision provides in pertinent part:

> No city or town shall be liable for damages for injury done to or wrong
> suffered by any person or corporation, unless such injury or wrong was done
> or suffered through the neglect, carelessness or unskillfulness of some agent,
> officer or employee of the municipality engaged in work therefor and while
> acting in the line of his or her duty . . . .

Ala. Code § 11-47-190 (2001). The city's argument in this regard begins: "Plaintiffs offer

wantonness as an alternative theory of defendants [sic] misconduct. The City, of course

cannot be liable for any conduct that is not based upon the negligence or unskillfulness of

its employees."   Beyond this brief statement, the city has not made clear to which of

plaintiff's claims it is addressing its argument.   Montgomery, in response, admits that

29

summary judgment is due to be granted in favor of the city on his malicious prosecution claim because a city cannot be liable, under Ala. Code § 11-47-190, for the malice of its agents. *See Franklin v. City of Huntsville*, 670 So. 2d 848, 852 (Ala. 1995). Malice, of course, is a necessary element of the tort of malicious prosecution. *Delchamps, Inc. v. Larry*, 613 So. 2d 1235, 1238 (Ala. 1992).

As to the other torts, the court notes that Alabama courts have held that Ala. Code § 11-47-190 does not necessarily preclude claims against the city for false arrest and assault and battery that were committed by agents of the city due to their negligence or unskillfulness. *See Franklin v. City of Huntsville*, 670 So. 2d 848, 852 (Ala. 1995). Without anything more from the city than a statement of statutory law and an unclear, indirect, and conclusory argument, the court is not prepared to state that the plaintiff cannot succeed, as a matter of law, on its claims of false arrest/imprisonment and assault and battery against the city, given both the narrow construction of "intentional" that Alabama courts have applied in regard to § 11-47-190, and the broad construction that the Supreme Court of Alabama has given "unskillfulness" as it is used in the same statute. *See Oladeinde v. City of Birmingham*, 118 F. Supp. 2d 1200, 1206 (N.D. Ala. 1999);[15] *Birmingham v. Thompson*, 404

---

[15]The court in *Oladeinde* noted:

Alabama courts have construed § 11-47-190 to absolve municipalities from liability for "intentional" tortious conduct by their agents or employees. The language of the Alabama cases, taken out of context, would at first glance seem to support City's position, but there is an important difference between the broad meaning of "intent" under *federal* law, for purposes of punitive damages under § 1983, and "intent" under *Alabama* law for purposes of § 11-47-190. Although Alabama courts have interpreted § 11-47-190 to preclude municipal liability for intentional wrongdoing by an employee, those same courts have consistently used the term "intent" in reference to *willful* intent or actual malice. In other words, Alabama case law has consistently granted municipal immunity under § 11-47-190 *only* when the wrongful conduct involved an intent to break the law.

So. 2d 589, 592 (Ala. 1981). Summary judgment is therefore due to be granted in regard to Montgomery's malicious prosecution claim against the city and denied, for the present time, in regard to his false arrest and assault and battery claims against the city. As with the other claims, the court will await the jury's fact finding to determine if the officers' actions were of such a nature as to render the city not liable for the claims pursuant to Ala. Code § 11-47-190.

**V.    Conclusion**

After thoroughly reviewing the parties' submissions and the record, the court is of the opinion that summary judgment is due to be granted in part as follows:  (1) as to Chief Coppage, all of Montgomery's claims;  (2) as to the City, all of Montgomery's federal claims, and his state law malicious prosecution claim; and (3) as to defendants Dunn and Newfield, Montgomery's Fourteenth Amendment deliberate indifference to serious medical needs claim.  Summary judgment is due to be denied in all other respects. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___**28th**___ of March, 2002.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

---

*Oladeinde*, 118 F. Supp. 2d at 1206.